Filed 7/7/26  P. v. Gonzalez CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G064880 |
| v. | (Super. Ct. No. 14WF1826) |
| BRYAN ALEXIS GONZALEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Kimberly K. Menninger, Judge. Affirmed.

James R. Bostwick, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Sahar Karimi and Jon S. Tangonan, Deputy Attorneys General, for Plaintiff and Respondent.

\*                \*                \*

Appellant Bryan Alexis Gonzalez was convicted of second degree robbery, kidnapping, second degree burglary, kidnapping to commit robbery, and dissuading a witness from reporting a crime. On appeal, Gonzalez argues the trial court abused its discretion by denying his motions to strike a prior serious and violent felony and to strike a sentencing enhancement for personal use of a firearm. Gonzalez also argues the prosecution violated the California Racial Justice Act of 2020 (RJA) (Stats. 2020, ch. 317, § 3.5; Pen. Code,[1] § 745) by introducing evidence he is Hispanic and Hispanic gangs are especially violent and criminal. We find no error and affirm Gonzalez's conviction.

FACTS

*A. Factual Background*[2]

"One evening in May 2014, between 10:00 and 11:00 p.m., a man and his fiancée were walking to their car parked near the Huntington Beach pier, when they saw three men in or near a Jeep, including one in the back seat cleaning a revolver. The man outside the Jeep asked them for change for the parking meter, which the couple explained they did not have. As the man with the gun exited the Jeep, he put the gun in his waistband area; he appeared to be in his early 20's and wore a black shirt and black pants. The couple got in their car, drove away, and reported their observations to the police.

"Around 10:30 p.m. that night, Tosha S. and her date drove to Huntington Beach, parked on Pacific Coast Highway, and walked to a fire pit

---

[1] All further statutory references are to the Penal Code.

[2] The following statement of facts is from this court's opinion in Gonzalez's previous appeal in *People v. Gonzalez* (June 27, 2019, G055245) [nonpub. opn.].

2

on the beach where they sat down alone. Within about 15 minutes, a man Tosha later positively identified to police as defendant, approached the couple. He stood over them, drew a gun, and said, 'Give me everything you got.' Frightened, they complied, handing the man their cell phones, a Bluetooth radio, and some marijuana. When Gonzalez demanded money, which Tosha said she had in her car, he instructed them to leave their shoes behind as he walked them to the car. He warned, 'If you try anything, I'm going to kill you.'

"Gonzalez remained about a foot behind the couple as they walked. He threatened that 'if [they] tr[ied] anything funny,' he would shoot. They crossed a sandy stretch of beach from the fire pit, climbed over a short wall, and then traversed the parking lot to their car parked next to the sidewalk along Pacific Coast Highway[]. The distance was roughly 100 yards.

"Tosha opened her car door and gave Gonzalez seven dollars from her car visor. When he asked, 'That's it?,' she responded that it was all she had. Four girls walked by on the sidewalk, and Tosha tried to get their attention by stating loudly that she had no more money, but the girls did not stop, and Tosha feared she would be shot if she yelled out that she was being robbed.

"Gonzalez directed Tosha's date to open the car trunk; when he did, Gonzalez grabbed a new cell phone still in its box. Tosha was seated in the car and when she started it, Gonzalez threatened to kill them if they called the police.

"After Tosha's date got into the car, the couple drove to Main Street and found a police officer. Tosha told the officer about the incident and gave him defendant's description. Other officers in the area were then notified about the robbery.

3

"Around 10:36 p.m., the first couple's report regarding the man cleaning a gun in the Jeep was also broadcast to officers in the area, and the man who made that report accompanied officers to show them where the Jeep was parked.

"At about the same time, a worker at a nearby bicycle rental kiosk was moving his bicycles from a street kiosk to load them into a truck. The kiosk was near the same intersection where Tosha's car had been parked. As the worker organized his bicycles, he returned to the kiosk to retrieve a pink bicycle and saw that it was missing. The bicycle had the kiosk's name on the front.

"An officer consulting with other officers about the reports of the man cleaning a gun and the robbery near the fire pits later spotted Gonzalez riding through a beach parking lot on a pink bicycle. The officer aimed his flashlight at defendant and called out 'Police, stop.' Gonzalez did not stop. Instead, he pedaled away toward Beach Boulevard, with the officer in pursuit on foot.

"As Gonzalez approached the parking lot exit, he was unable to maneuver the bicycle under the exit gate and fell off. He ignored the officer's order to stay on the ground. Instead, he stood up and began running. When he stood, a handgun fell to the ground. He abandoned the bicycle between 100 and 200 yards from the rental kiosk. The officer chased Gonzalez and ultimately he was detained. Officers found four cell phones on his person. The gun that fell from his waist was later determined to be a working revolver; it was unloaded when the officers recovered it.

"Meanwhile, back at the Jeep, two men got in and drove away. Just after 11:00 p.m., officers pulled the Jeep over. Inside they found a

4

cartridge casing that later proved to be consistent with having been fired by the revolver dropped by Gonzalez.

"Everado Baiza was the driver of the Jeep, and Edgar Lopez Gomez was the passenger. Both men, like [Gonzalez], were admitted members of the 17th Street gang who had been stopped in the past along with [Gonzalez] by Garden Grove police officers investigating the gang's activities.[3] [Gonzalez]'s moniker in the gang was 'Whispers.' Expert testimony at trial indicated the gang's primary activities included unlawful firearm possession and vandalism.

"Officers took Tosha to where they had detained [Gonzalez]. She identified him and the gun he used in the robbery. Just outside the bicycle rental kiosk, an officer found a cell phone case that belonged to Tosha.

"When told at the jail that he was being booked for robbery, [Gonzalez] said, 'I didn't rob that bitch. I was just asking aggressively.' Another officer transported Lopez to the same jail. As the officer walked Lopez past [Gonzalez]'s cell, Gonzalez said, 'Damn bro. We got to go through this shit again.' Addressing [Gonzalez] as Whispers, Lopez told him to shut up.

"On Tosha's cross-examination, defense counsel elicited that [Gonzalez] stated at the fire pit that he was 'sorry' and claimed he 'had to feed his family.' Tosha testified she feared [Gonzalez] would carry out his threats to shoot her." (*People v. Gonzalez, supra*, G055245 [nonpub. opn.].)

*B. Procedural History*

---

[3] Before trial, codefendants Baiza and Lopez each pleaded guilty to violating [Penal Code] section 29815, subdivision (a) (violating probation condition prohibiting possession of firearms), admitted as true the gang enhancement, and were sentenced to seven years in state prison.

In 2017, a jury convicted Gonzalez of two counts of second degree robbery (§§ 211/212.5, subd. (c); counts 1 and 2), active participation in a criminal street gang (§ 186.22, subd. (a); count 5); felon in possession of a firearm (§ 29800, subd. (a)(1); count 6), second degree commercial burglary (§§ 459–460, subd. (b); count 7), receiving stolen property (§ 496, subd. (a); count 8), two counts of kidnap to commit robbery (§ 209, subd. (b); counts 9 and 10); and dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1); count 11). The jury also found true the enhancement allegations on several counts alleging Gonzalez committed the crimes for the benefit of a criminal street gang (§ 186, subd. (b)(1) & (4)) and that he personally used a firearm in committing those offenses. (§§ 1192.7, 667.5, 12022.53, subd. (b).) In a bifurcated proceeding, the trial court found true a prior serious and violent felony strike allegation, as well as a prior serious felony conviction. The court sentenced him to a term of 45 years to life.

On appeal, this court affirmed the judgment but remanded on various sentencing issues, concluding the trial court had discretion to dismiss enhancements under amendments to sections 12022.53, subdivision (b) and 667, subdivision (a), and that those amendments applied retroactively to Gonzalez's nonfinal judgment. This court also found the trial court erred by failing to impose sentence on counts 5 and 8 and directed the court to impose and stay execution of those sentences under section 654. This court further concluded the trial court may have denied Gonzalez's motion under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*) based on erroneous factual statements in the probation report and accordingly directed the court to clarify its remarks on remand. The remand order specified the court had discretion to "modify any aspect of Gonzalez's sentence on any count or enhancement in order to achieve the court's sentencing objectives."

6

On remand, Gonzalez requested the trial court strike his firearm enhancement, prior serious felony enhancement, and prior strike conviction under *Romero*. The court denied Gonzalez's requests to dismiss the firearm enhancement and prior strike conviction but granted his request to dismiss the prior serious felony enhancement under section 1385 in the interests of justice. The court also denied Gonzalez's claim the gang evidence violated the RJA.

On resentencing, the trial court exercised its discretion under section 1385 to dismiss Gonzalez's conviction in count 5 for participation in a criminal street gang and to dismiss the gang enhancement allegations. The court selected kidnapping to commit robbery in count 9 as the principal offense and imposed an aggregate sentence of 24 years to life.

DISCUSSION

I.

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING GONZALEZ'S MOTION TO DISMISS HIS PRIOR STRIKE

Gonzalez contends the trial court abused its discretion in declining to dismiss his prior strike under *Romero* because he committed the strike offense when he was a minor and because the court gave undue weight to the egregiousness of the current offenses. We conclude the court did not abuse its discretion in declining to dismiss Gonzalez's prior strike.

A. *Factual Background*

During the original sentencing proceedings, defense counsel made an oral motion to strike Gonzalez's prior strike, arguing he was entitled to relief based upon the fact he was 17 when he committed the prior burglary,

7

the gun used in the current offense was unloaded, and the monetary loss was small. The trial court denied the *Romero* motion.

On remand, defense counsel filed a written sentencing brief, which included a request to strike Gonzalez's prior strike under *Romero*. The trial court rejected Gonzalez's request as follows:

"[T]he court has given serious consideration to the request made by [Gonzalez] to strike his prior strike. When considering imposing and striking the strike pursuant to the Three Strikes Law, the court first looks at the intent of the statute.

"The legislature has stated that the purpose of this law is to ensure longer prison sentences and greater punishment for those who commit a felony, or certain kinds of felonies, and have been previously convicted or adjudicated of serious and/or violent felonies. In this case, it would be [a] serious felony in the new case as well. [¶] The court has considered many factors in determining if a strike sentence is appropriate in this case or if striking the strike would be appropriate."

The trial court then noted the eyewitnesses testified that, although Gonzalez did not point the gun directly at their heads or bodies, he did stand close enough to shoot them and warned them he would kill them if they "'tr[ied] anything,'" including when he walked behind them to steal items from their car. The court stated, "So those are the facts that the court is looking at. And it was a serious case. It was a scary case for these victims. They were sitting out there having a nice evening together as a couple on the beach, not expecting anything terrible to happen to them when this occurred."

The trial court also noted the current offenses occurred only two years after the prior strike, although Gonzalez committed the prior crime

8

when he was still a minor. The court concluded, "The court has weighed and considered and reconsidered the facts of this case, the probation and sentencing report, the appellate decision, and the court . . . believe[s] that this case does still fall within the Three Strikes spirit. [¶] And the court has a couple of strong concerns about it, and that is because of the use of the gun throughout the entirety of this activity for people he had never met before in his life that . . . had nothing to do with him. There was no challenge, no problem. He just randomly walked up, chose two people sitting on the beach and decided to do this to them. And it was just extremely aggressive and violent. And it's exactly what Three Strikes was designed to do, was to protect the public from people who behaved like this."

## B. Legal Standard

"The Three Strikes law is designed to increase the prison terms for repeat felons. [Citations.] When a defendant is convicted of a felony, and it is pleaded and proved he had committed prior 'violent' or 'serious' felonies, the Three Strikes law provides for the imposition of increased sentences. [Citations.] A trial court is presumed to have acted properly whenever it sentences a defendant in accordance with the Three Strikes law." (*People v. Nunez* (2023) 97 Cal.App.5th 362, 370.)

"A court's discretion to strike prior felony conviction allegations in furtherance of justice is limited. Its exercise must proceed in strict compliance with section 1385(a), and is subject to review for abuse." (*Romero*, *supra*, 13 Cal.4th at p. 530.) "'"[T]he language of [section 1385], 'in furtherance of justice,' requires consideration both of the constitutional rights of the defendant, and *the interests of society represented by the People*, in determining whether there should be a dismissal."'" (*Ibid.*)

9

When ruling on a *Romero* motion, "the court . . . must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

A court's refusal to strike a prior conviction under the Three Strikes law is "subject to review under the deferential abuse of discretion standard." (*People v. Carmony* (2004) 33 Cal.4th 367, 374 (*Carmony*).) "[A] trial court will only abuse its discretion in failing to strike a prior felony conviction allegation in limited circumstances. For example, an abuse of discretion occurs where the trial court was not 'aware of its discretion' to dismiss [citation], or where the court considered impermissible factors in declining to dismiss [citation]." (*Id.* at p. 378.)

"In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, "'[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.'" [Citations.] Second, a "'decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.'" [Citations.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or

10

arbitrary that no reasonable person could agree with it." (*Carmony*, *supra*, 33 Cal.4th at pp. 376–377.)

*C.  Analysis*

Here, Gonzalez has failed to meet his burden to show the trial court's sentencing decision was irrational or arbitrary, and we therefore presume the court acted to achieve legitimate sentencing objectives. (*Carmony*, *supra*, 33 Cal.4th at p. 377.) The court noted it had reviewed and considered all the court files and probationary reports for both the prior strike and current offenses. The court then explained its reasons for its decision not to strike the prior burglary conviction, including consideration of the legislative intent of the Three Strikes statute, the fact the prior strike occurred only two years before the current offenses, and the circumstances of the crimes, including that Gonzalez used a gun and caused serious fear to his victims, who were strangers to him. Thus, the court concluded Gonzalez fell within the spirit of the Three Strikes law.

Having reviewed the record, we disagree with Gonzalez's contention the trial court failed to properly consider that his prior strike was committed when he was a minor. The court did note Gonzalez was 17 years old when he committed the prior burglary but also noted the prior strike was committed just two years before the current offenses. We also disagree with Gonzalez that the court gave undue weight to the seriousness of the current offenses. Although the court addressed the egregiousness of the current crimes, it also, as noted, weighed various other factors in declining to strike the prior burglary. Here, "'the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law.'" (*Carmony*, *supra*, 33 Cal.4th at p. 378.)

11

## II.

### THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING GONZALEZ'S MOTION TO DISMISS HIS FIREARM ENHANCEMENT

Gonzalez argues the trial court abused its discretion in denying his request to dismiss the firearm enhancement (§ 12022.53) pursuant to section 1385. He contends remand is required because the court did not fully articulate the factors it considered. We disagree.

### A. Factual Background

Gonzalez filed a resentencing brief which requested the trial court strike or dismiss his firearm enhancement in the interests of justice pursuant to section 1385. At the resentencing hearing, the court noted it was aware that it could have reduced, stricken, or dismissed the enhancement but "chose instead to impose the ten years." The court also acknowledged defense counsel's argument that Gonzalez was a minor at the time he committed the prior felony strike but noted Gonzalez terrified the victims and used a gun in the current crimes. The court also acknowledged Gonzalez's positive behavior and programming, noting, "He seems like he's turned things around while he's in prison. I want to give him credit for that."

### B. Legal Standard

Section 1385 gives a sentencing court discretion to dismiss or strike a sentencing enhancement, or strike the additional punishment for the enhancement, in furtherance of justice. (§ 1385, subds. (a), (c)(1).) In 2022, Senate Bill No. 81 (2021-2022 Reg. Sess.) amended section 1385 to include subdivision (c), which now provides that "[n]otwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." (§ 1385, subd. (c)(1).) Section 1385, subdivision (c)(2), provides as

12

follows: "In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." As relevant here, these mitigating circumstances include: "(A) [a]pplication of the enhancement would result in a discriminatory racial impact as described in paragraph 4 of subdivision (a) of Section 745; (B) [m]ultiple enhancements are alleged in a single case; (C) [t]he application of an enhancement could result in a sentence of over 20 years; and (I) [t]hough a firearm was used in the current offense, it was inoperable or unloaded." (§ 1385, subd. (c)(1)(A)–(C) & (I).)

The requirement in section 1385 subdivision (c)(2) that a sentencing court "afford great weight" to mitigating circumstances does not create a rebuttable presumption in favor of dismissing an enhancement unless the trial court finds that dismissal would endanger public safety. (*People v. Walker* (2024) 16 Cal.5th 1024, 1033.) Rather, "absent a finding that dismissal would endanger public safety, a court retains the discretion to impose or dismiss enhancements but must assign significant value to the enumerated mitigating circumstances when they are present." (*Id.*, at p. 1029.) Thus, "the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement, unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement [would] not be in furtherance of justice. [Citation.]'" (*Id.* at p. 1036.)

The trial court is not required to state reasons for declining to exercise its discretion under section 1385 (*In re Large* (2007) 41 Cal.4th 538, 550), and "is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary" (*People v. Myers* (1999) 69 Cal.App.4th 305, 310). When, as here, the record is silent as to the trial court's reasons, we presume that the trial court "'correctly applied the law.'" (*Carmony*, *supra*, 33 Cal.4th at p. 378.) We review for abuse of discretion a lower court's decision not to strike a sentencing enhancement under section 1385. (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 298.)

## C. Analysis

The trial court did not abuse its discretion in declining to dismiss the firearm enhancement. The court expressly considered Gonzalez's age at the time he committed the prior strike and his rehabilitation while in prison but found these factors did not outweigh the fact he terrorized the victims and used a firearm during the current offense. Although the court did not explicitly conclude that dismissal would "endanger public safety," it implicitly did so by noting the victims' fear and the seriousness of kidnapping and robbing the victims at gunpoint.

Furthermore, a review of the record demonstrates the trial court was aware it had discretion under section 1385 to strike the firearm enhancement but chose not to. The court also explicitly noted it had read and considered all of Gonzalez's arguments made in his resentencing brief. Based on the record before us, the court did not abuse its discretion.

## III.

### THE GANG EXPERT'S TESTIMONY DID NOT VIOLATE THE RJA

Gonzalez contends that "repeated references" by the prosecution's gang expert to "the reputation of Hispanic gangs and individual members for

14

violence" constituted a violation of the RJA because such testimony "effectively penalized [Gonzalez] because of his [Hispanic] ethnicity." We disagree.

*A. Factual Background*

On remand for resentencing, defense counsel claimed a violation of the RJA but neither filed a formal motion nor provided any statistics or comparison cases. The trial court offered defense counsel the opportunity to file a supplemental brief regarding the alleged RJA violation.

Defense counsel thereafter submitted a supplemental sentencing brief regarding the alleged violation of section 745. Defense counsel conceded that, given the unique nature of the crimes, statistical data of similar crimes would be impossible to procure. Instead, the supplemental brief argued the prosecution obtained Gonzalez's conviction based on his race. In particular, the prosecution's gang expert, Officer Delgado, described Gonzalez as Hispanic and testified that "Hispanic gangs are violent," therefore causing the jury to unfairly view Gonzalez as a violent gang member based on his race.

During the hearing on Gonzalez's RJA claim, defense counsel argued: "There is no value to the jury in repeating the word 'Hispanic' before saying gang. The expert could say 17th St. is a violent gang, [Gonzalez] is a member of it, and this crime was committed to benefit the gang and its violent tendencies. But when you keep saying the word 'Hispanic' over, and over, and over again, it adds nothing to the analysis for the jury. Rather, it pollutes the jury in that Hispanics are more likely to be violent, they are more likely to join a gang, and, therefore, my client being a member of the Hispanic race would, therefore, be more likely than not to be guilty. And so I

15

believe the trial was infected by [RJA] violations, and that's my primary focus of my motion."

The prosecution disagreed: "The People believe the defense has not shown a prima facie case at this point. There's no literature attached, no declarations from an expert. It's merely defense counsel's opinion that the word 'Hispanic,' when not used in a derogatory way at all, the examples shown in their brief, but rather just as a descriptive. . . . [¶] This court is familiar that different gangs in different cultures beha[ve] in different ways, have different tendencies, and different rules of operation.

"And Penal Code section 745 and the RJA was talking about using terms in a derogatory way, in a negative way. This was just in a descriptive way that it was a gang that was predominately having Hispanic members, not meant in a derogatory way. And without any supplemental briefs or information, it's just really an opinion, and we don't believe that rises to the prima facie level[]."

The trial court responded: "First of all, there wasn't sufficient evidence that was submitted to the court. [¶] Secondly, the proposition that's being suggested by counsel, and you're not the first person to suggest it in this courtroom, is that the mere use of the phrase 'Hispanic criminal street gang' is, in and of itself, a violation of the [RJA]. And I'm hoping we can get some law that clarifies this, but from this court's position, that would be a ludicrous determination."

The trial court then cited *People v. Lamb* (2024) 16 Cal.5th 400 (*Lamb*), wherein the Supreme Court held that evidence and testimony regarding the distinctive characteristics of various kinds of gangs whose members are primarily composed of a certain race or ethnicity is a proper subject of expert testimony.

16

The trial court continued, "It is critical to the understanding of these gangs to know their history, to understand that there [are] the Norteños, and to understand there's La Eme. That the state is divided in half. To understand how these all work is critical to understanding why people operate in the manner in which they do within that particular gang. [¶] And to call it something else I think would be disingenuous to the roots and to the history of how these particular gangs started, just like it would be to call a white supremacist gang some other gang that might be less offensive to people in describing what their desires and efforts are."

## B. Legal Standard

"The express purpose of the [RJA] is 'to eliminate racial bias from California's criminal justice system because racism in any form or amount, at any stage of a criminal trial, is intolerable [and] inimical to a fair criminal justice system . . . .' (Stats. 2020, ch. 317, § 2, subd. (i) [uncodified].)" (*Bonds v. Superior Court* (2024) 99 Cal.App.5th 821, 828.) "[T]he [RJA] was enacted to address much more than purposeful discrimination based on race. Indeed, the primary motivation for the legislation was the failure of the judicial system to afford meaningful relief to victims of unintentional but *implicit* bias." (*Ibid.*)

"To further the goal of eliminating racial bias in criminal proceedings, subdivision (a) of section 745, provides that '[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin.'" (*People v. Lashon* (2024) 98 Cal.App.5th 804, 809.) "The Act sets forth four categories of conduct, any of which, if proved, is enough to 'establish' a violation of section 745, subdivision (a)." (*Young v. Superior Court* (2022) 79 Cal.App.5th 138, 147.)

17

As relevant here, section 745, subdivision (a)(2) provides: "During the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful. This paragraph does not apply if the person speaking is relating language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect."

Section 745, subdivision (h)(4) defines "'[r]acially discriminatory language'" as "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin. Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory."

A defendant may raise a prejudgment claim of an RJA violation by filing a motion in the trial court. (§ 745, subd. (b).) To obtain a full evidentiary hearing, the defendant must make a prima facie showing that a violation occurred. (§ 745, subd. (c).) A "'prima facie showing' means that the defendant produces facts that, if true, establish a substantial likelihood that a violation of [section 745,] subdivision (a) occurred." (§ 745, subd. (h)(2).) A "substantial likelihood" under the RJA "requires more than a mere possibility, but less than a standard of more likely than not." (*Ibid.*) "The

18

prima facie threshold is thus lower than the preponderance of the evidence standard required to establish an actual violation of the [RJA]." (*Finley v. Superior Court* (2023) 95 Cal.App.5th 12, 22 (*Finley*).)

"[A] defendant seeking relief under the [RJA] must state fully and with particularity the facts on which relief is sought, and include copies of reasonably available documentary evidence supporting the claim. The court should accept the truth of the defendant's allegations, including expert evidence and statistics, unless the allegations are conclusory, unsupported by the evidence presented in support of the claim, or demonstrably contradicted by the court's own records." (*Finley*, *supra*, 95 Cal.App.5th at p. 23, fn. omitted.)

A trial court's ruling the defendant failed to make a prima facie showing of a violation of the RJA is reviewed de novo on appeal. (*People v. Howard* (2024) 104 Cal.App.5th 625, 650.)

C. *Analysis*

On our de novo review, we conclude Gonzalez has failed to make a prima facie showing of a violation of the RJA. First, the appeal fails to allege specific facts to support a claim Gonzalez's conviction was obtained due to racial discrimination. Gonzalez does not provide any supporting documentary evidence regarding his claim, such as statistical evidence or aggregate data. Nor does Gonzalez cite any authority which holds that use of the term "Hispanic" by a gang expert witness in relation to discussion of gang activity is a violation of the RJA.

In fact, in cases decided after the RJA was enacted, courts have considered expert witness testimony regarding the racial or ethnic composition of various criminal street gangs without concluding such testimony violated the RJA. For example, as noted by the trial court, our

19

Supreme Court considered expert witness testimony regarding PEN1, a white supremacist gang, which compared the gang's violence with "'traditional gangs, Black and Hispanic gangs.'" (*Lamb*, *supra*, 16 Cal.5th at pp. 450–451, fn. 18; see also *People v. Tran* (2022) 13 Cal.5th 1169, 1185, 1210 [expert testimony regarding Asian gang culture].)

We have also reviewed Gonzalez's supplemental brief filed in the trial court to determine whether it alleges a prima facie violation of the RJA. The brief cites portions of Officer Delgado's testimony[4] as a gang expert witness to argue his repeated use of the term "Hispanic" to discuss Gonzalez's gang membership in particular and gang culture in general is racially discriminatory. Our review of these excerpts of Officer Delgado's testimony do not establish that he used "'racially discriminatory language.'" (§ 745, subd. (h)(4).) Rather, Officer Delgado was testifying to the general history and background of Hispanic gangs and distinguishing them from other gangs whose members are generally composed of a certain race or ethnicity. As noted, a defendant seeking relief under the RJA "must state fully and with particularity the facts on which relief is sought, and include copies of reasonably available documentary evidence supporting the claim." (*Finley*, *supra*, 95 Cal.App.5th at p. 23.) Gonzalez has failed to do so. The excerpts of Officer Delgado's testimony do not establish a violation of the RJA.

---

[4] We note Gonzalez did not provide this court with a copy of the reporter's transcript of Officer Delgado's trial testimony.

# DISPOSITION

The judgment is affirmed.


                                        SANCHEZ, ACTING P. J.

WE CONCUR:


DELANEY, J.


SCHWARM, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.